*1162 TEXTO COMPLETO DE LA SENTENCIA
Comparece el Sr. Rubén Maldonado González mediante el recurso de revisión de epígrafe. Solicita que revoquemos la Resolución emitida por la Junta de Síndicos de la Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura (Junta) el 30 de octubre de 2008, notificada el 16 de diciembre de 2008 (Resolución). En la Resolución, la Junta confirmó la decisión emitida por la Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura (Administración) de denegar la solicitud del recurrente para que se le concedieran los beneficios de una pensión por incapacidad ocupacional y no ocupacional. Confirmamos.
I
El recurrente actualmente tiene cincuenta (50) años de edad y trabajó como Oficial de Custodia en la Administración de Corrección. Allí cotizó veintidós (22) años de servicios para el Sistema de Retiro de los Empleados del Gobierno y la Judicatura.
El recurrente sufrió tres (3) accidentes de carácter laboral, por los cuales se reportó a la Corporación del Fondo del Seguro del Estado (CFSE) en los siguientes casos: 1) Caso Núm. 97-71-00394-9 de un accidente ocurrido el 9 de enero de 1998 por el cual sufrió trauma en la rodilla derecha, trauma lumbar, trauma sacral y condición emocional; 2) Caso Núm. 02-71-00467-1 de un accidente ocurrido el 22 de febrero de 2002 a causa del cual sufrió un status post costado derecho, status post “strain” cervical, “strain” en el hombro derecho y condición emocional; y 3) Caso Núm. 06-71-00318-7 de un accidente ocurrido el 3 de enero de 2006 por el cual sufrió traumas en el pecho, la cabeza y el área dorsal. Además de las condiciones relacionadas por la CFSE, la Administración evaluó las siguientes condiciones del recurrente: a) trauma cervical; b) miositis cervical; c) radiculopatía cervical; d) cambios espondilóticos en la región cervical C6-C7; e) “strain” lumbosacral; y f) radiculopatía lumbosacral L5-S1.
El 17 de abril de 2006, el recurrente solicitó los beneficios por incapacidad ocupacional y no ocupacional ante la Administración al amparo de la Ley Núm. 447 de 15 de mayo de 1951, según enmendada (Ley 447), 3 L.P.R. A. sees. 761 y ss. El 22 de febrero de 2007, la Administración le denegó los beneficios de pensión por incapacidad porque, conforme la evidencia médica incluida en el expediente administrativo, no demostró que estuviera total o permanentemente incapacitado para cumplir con las funciones de su cargo.
Inconforme, el 20 de marzo de 2007, el recurrente apeló a la Junta. El 5 de junio de 2007, la Administración se opuso a la apelación y se reiteró en su decisión. Luego de varios incidentes procesales, el 2 de abril de 2008, la Junta celebró una vista administrativa, en la cual, entre otras cosas, evaluó el testimonio prestado por el recurrente y la siguiente prueba documental:

"a. Expediente de la Corporación del Fondo del Seguro del Estado.

b. Estudio radiológico efectuado por el Dr. Antonio Maldonado el 75 de enero de 1997. Se indica lo siguiente: “Right Knee: Opinion: Normal Right Knee; Right Hip: Opinion: Normal Right Hip; Lumbosacral Spine:

*1163
Opinion: Normal Lumbosacral Spine

c. MRI de la rodilla derecha realizado por el Dr. René Dietrich el 25 de febrero de 1997. Se expresa lo siguiente:

“Study compatible with small effusion in the articular cavity of the right knee. There is also small fluid collection in the subcutaneous tissue of the anteromedial aspect of the- knee could represent small hematoma. Otherwise, the MRI of the right knee is normal. No evidence of meniscal tear. ”

d. Estudio radiológico de la mano derecha efectuado por el Dr. Castro Ramírez el 16 de julio de 1997. Se señala lo siguiente: “No evidence of fracture, dislocation or focal bone lesion ”.

e. Evaluación mental realizada por el Dr. Pablo Pérez Torrado el 22 de julio de 1997. Se indica lo siguiente: el recurrente aparenta su edad; tiene una postura erecta y su marcha es lenta; al caminar cojea de la pierna derecha; su apariencia es adecuada; buena higiene personal; luce tenso y angustiado; hostil e intranquilo; disminución de su actividad psicomotora; movimientos normales; presenta rigidez en el antebrazo derecho y la rodilla derecha; espontáneo, su articulación es clara; su entonación es normal y apropiada; su afecto es adecuado; el flujo de pensamientos normal; asociaciones organizadas y dirigidas a una meta; lógico, coherente y relevante; presenta bloqueos mentales; ausencia de trastornos en el pensamiento; sin obsesiones y compulsiones; sin ideas suicidas; sin delirios; orientado en las tres esferas; memoria inmediata menoscabada; memoria reciente parcialmente disminuida; memorias reciente, remota y pasada están adecuadamente conservadas; menoscabo en la atención y la concentración; su juicio y autoconocimiento adecuados. Se le diagnosticó síndrome de estrés post traumático crónico.

f. Evaluación mental realizada por el Dr. Juan A. Guillén el 27 de septiembre de 1997. Se expresa lo siguiente: el recurrente lo visita desde junio de 1997 y lo ha visitado en tres ocasiones; no tiene historial de hospitalizaciones psiquiátricas; buen desarrollo físico; nutrido; higiene; cooperador, no espontáneo; tenso; con retardación psicomotora; es coherente, relevante y lógico; asociación de ideas adecuadas; ideas de insuficiencia; desesperanza; agresivo; sin ideas suicidas u homicidas; sin trastornos preceptúales; irritable; deprimido; ansioso; orientado en persona y lugar; parcialmente orientado en tiempo; memoria inmediata y reciente pobres; memoria remota adecuada; tolerancia del estrés pobre; y sin historial de ataques de pánico. Se le diagnosticó trastorno de ansiedad generalizada.

g. Evaluación mental realizada por el Dr. Pablo Pérez Torrado el 16 de enero de 1998. Se señala lo siguiente: el recurrente aparenta su edad; su postura es erecta y su marcha es lenta; al caminar cojea de la pierna derecha; su apariencia es adecuada; buena higiene personal; luce tenso, angustiado e intranquilo; disminución de su actividad psicomotora; movimientos normales; presenta rigidez en el antebrazo derecho y rodilla derecha; fluidez espontánea; articulación clara; entonación normal y apropiada; irritable; afecto adecuado; flujo de pensamiento normal; asociaciones organizadas y dirigidas a una meta; luce lógico, coherente y relevante; presenta bloqueos mentales; sin ideas suicidas; sin delirios; orientado en las tres esferas; atención y concentración disminuidas; juicio y autoconocimiento adecuados. Se le diagnosticó síndrome de estrés post traumático.

h. Evaluación mental del Centro de Salud Mental CAPITAS de 9 de octubre de 1999, en la cual se indica: el recurrente está orientado en las tres esferas; su memoria es adecuada; su lenguaje es apropiado; luce limpio, aseado y bien vestido; responde a preguntas apropiadamente; su afecto y ánimo decaídos; y tono de voz bajo con alucinaciones auditivas. Se le diagnosticó síndrome de estrés post traumático.

i. Evaluación mental efectuada por el Dr. Pablo Pérez Torrado el 21 de agosto de 2000, en la cual se expresa: el recurrente aparenta su edad; su postura es erecta y su marcha lenta; sin deformidades; no uso de prótesis; apariencia adecuada; buena higiene personal; luce angustiado; actividad psicomotora disminuida; con 
*1164
movimientos normales; rigidez en el antebrazo derecho y la rodilla derecha; fluidez espontánea; articulación clara; afecto adecuado, sin alteración en el sistema sensorial; sin trastornos de percepción; flujo de pensamiento normal; asociaciones organizadas y dirigidas a una meta; lógico, coherente y relevante; sin bloqueos mentales o trastornos del pensamiento; sin obsesiones o compulsiones; sin ideas suicidas y homicidas; sin delirios; orientado en las tres esferas; memorias inmediata y reciente disminuidas; memorias remota y pasada conservadas; atención y concentración disminuidas; y juicio y autoconocimiento conservados. Se le diagnosticó depresión mayor, episodio recurrente; y síndrome de estrés post traumático.

j. Estudio radiológico del hombro derecho y la espina cervical efectuado por el Dr. Enrique T. Gorbea González el 19 de febrero de 2002. Se indica lo siguiente: “Right Shoulder: There is normal alignment of the bone structures. No fracture or dislocation is noted. There is no evidence of a bone lesion. The soft tissues are normal. Cervical Spine: There is normal alignment of the cervical vertebrae. The vertebral bodies are preserved in height. The joint spaces are well preserved. No fracture or subluxation is noted. The prevertebral soft tissues are normal. Impression: Normal Cervical Spine ”.

k. Evaluación ortopédica de la región cervical y el hombro derecho efectuada por el Dr. Rolando Colón el 5 de marzo de 2002. Se expresa lo siguiente: En la columna cervical, “[s]e encuentra en la línea media. El arco de movimiento activo es dentro de límites normales. No existe áreas de espasmo muscular”. En el hombro derecho, “[a] la inspección no presenta deformidades. Los movimientos activos son dolorosos en el paciente. La palpación de la articulación glenohumeral demuestra unas crepitaciones en el hombro. La abducción es dolorosa”. Se le diagnosticó status post contusión en la región cervical, y del hombro derecho. Se descartó rotura del manguito rotador o tendinitis del supraespinoso.

l. MRI del hombro derecho efectuado por el Dr. Manuel González Meléndez el 25 de marzo de 2002. Se indica lo siguiente: “No rotator cuff tear. Degenerative changes noted at its insertion in the greater tuberosity of the humerus”.

m. Evaluación mental realizada por el Dr. José Raimundi Meléndez el 25 de marzo de 2002, en la cual se expresa: el recurrente tiene apariencia normal; aseado; luce ansioso y deprimido; cooperador; volumen y tono de voz normal; pensamiento lógico, coherente y relevante; baja autoestima; sin ideas suicidas u homicidas; en ocasiones escucha voces; orientado en las tres esferas; memorias inmediata, reciente y remota preservadas; atención y concentración moderados; y juicio e introspección moderados. Se le diagnosticó trastorno de estrés post traumático.

n. Evaluación mental realizada por el Dr. José Raimundi Meléndez el 12 de diciembre de 2002, en la cual se expresa: el recurrente tiene apariencia normal; aseado; cooperador; volumen y tono de voz normal; lógico, coherente y relevante; buena autoestima; sin ideas suicidas u homicidas; sin trastornos de percepción; orientado en las tres esferas; memorias preservadas; atención y concentración adecuados; y juicio e introspección adecuados. Se le diagnosticó trastorno de estrés post traumático en remisión parcial.

o. Evaluación mental realizada por la Dra. Leticia Ubiñas López el 18 de diciembre de 2004 en la cual se señala: el recurrente es una 'persona con buen desarrollo físico y estado nutritivo; luce desaliñado; cooperador; no espontáneo; ligera disminución en la actividad motora; luce tenso y ansioso; leve disforia; su producción verbal es lenta; su tono de voz es normal; atención y concentración disminuidas; orientado en las tres esferas; memoria a corto plazo disminuida; lógico, coherente y relevante; refiere síntomas somáticos y preocupación ante la posibilidad de regresar al trabajo; sin ideas suicidas u homicidas; juicio y razonamiento conservados; e introspección superficial. Se le diagnosticó desorden de estrés post traumático y GAF estimado en 70%.

p. Evaluación mental del Centro de Salud Mental CAPITAS de 6 de junio de 2005 en la cual se indica: el recurrente presenta apariencia normal; cooperador; su ánimo es normal; afecto amplio; atención y memoria 
*1165
normales; proceso de procesamiento lógico; juicio y control de impulsos adecuados; intranquilo; lenguaje y orientación normales; concentración breve; sin alucinaciones; sin ideas suicidas u homicidas; e introspección superficial. Se le diagnosticó síndrome de estrés post traumático.

q. Evaluación mental del Centro de Salud Mental CAPITAS de 23 de enero de 2006 en la cual se expresa: el recurrente presenta apariencia normal; es cooperador; estado de ánimo ansioso y depresivo; afecto congruente; atención y memoria normales; proceso de pensamiento relevante; juicio y control de impulsos adecuados; lenguaje y orientación normales; concentración breve; alucinaciones auditivas; sin ideas suicidas u homicidas; e introspección superficial. Se le diagnosticó síndrome de estrés post traumático.

r. Evaluación neurológica realizada por el Dr. Héctor R. Stella el 4 de abril de 2006, en la cual se señala: el recurrente se presenta alerta; orientado en las tres esferas; y juicio adecuado. En la región del cuello se refleja dolor en la flexión al extender y en los movimientos laterales. En las extremidades normal. En cuanto al sistema motoro, el tamaño muscular es normal, el tono y la fuerza muscular normales, sistema sensorial adecuado y reflejos presentes. Se le diagnosticó contusión craneal, dolores de cabeza y mareos post traumáticos, y “cervical sprain ”.

s. Examen electromiográfico digital efectuado por el Dr. Héctor R. Stella el 18 y 19 de abril de 2006. Se indica lo siguiente: “Normal 24 hrs Digital EEG Study”.

t. MRI del cerebro efectuado por el Dr. Emilio Torres Reyes el 3 de mayo de 2006. Se indica lo siguiente: “Normal Study ”.

u. MRI de la espina cervical realizado por el Dr. Emilio Torres Reyes el 3 de mayo de 2006. Se indica lo siguiente: “Normal Study ”.

v. Examen electromiográfico de las extremidades inferiores realizado por el Dr. Luis J. Goveo el 15 de agosto de 2006. Se indica lo siguiente: “No electrodiagnostic evidence of lumbosacral radiculopathy, peripheral neuropathy, or focal nerve entrapment”.

w. Examen radiológico de la mano izquierda y la rodilla izquierda efectuado por el Dr. Luis Rodríguez el 18 de agosto de 2006. Se señala lo siguiente: “Left Knee: The bones and joints appear normal and well preserved. No fracture or dislocation is noted. Left Hand: “The bones and joints appear normal and well preserved. No fracture or dislocation is noted”.

x. MRI de la espina lumbar realizado por el Dr. Francisco Vargas el 18 de agosto de 2006. Se indica lo siguiente: “Spondyloarthritic changes at posterior articular facets joints of L5-S1 with associated encroachment upon right lateral recess. No evidence ofHNP or spinal canal stenosis ”.

y. MRI de la espina cervical efectuado por el Dr. Francisco Vargas el 18 de agosto de 2006. Se expresa lo siguiente: “Spondylotic changes at C6-C7. No evidence ofHNP or spinal canal stenosis”.

z. Examen electromiográfico de las extremidades superiores realizado por el Dr. Pablo Rodríguez Ryan el 24 de agosto de 2006. Se indica lo siguiente: “Findings are compatible with C5-C6 cervical radiculopathy”.

aa. Estudio de conducción nerviosa efectuado por el Dr. Pablo Rodríguez Ryan el 24 de agosto de 2006. Se expresa lo siguiente: “Findigns compatible with bilateral carpal túnel síndrome ”.

bb. Examen electromiográfico de las extremidades inferiores realizado por el Dr. Pablo Rodríguez Ryan el 24 de agosto de 2006. Se indica lo siguiente: “Findings compatible with L5-S1 lumbosacral radiculopathy”. 
*1166
cc. Evaluación médica efectuada por el Dr. Pablo Rodríguez Ryan el 5 de septiembre de 2006 en la cual se expresa: la primera visita del recurrente fue en agosto de 2006; su fuerza muscular es de 4/5 en todas las extremidades; sin atrofia; no requiere de objeto de apoyo; no puede pararse en talones ni en puntillas; reflejos de 3/3 en los tríceps y patelar, 2/3 en arcillas derechas y bíceps derechos, 1/3 en bíceps izquierdos y arcillas izquierdas; espasmos severo en la región cervical y lumbosacral; sin artritis; sin osteoartritis; sin fracturas, sin osteomelitis; y sin amputación. Se le diagnosticó miositis cervical, radiculopatía cervical, cambios espondilóticos C6-C7, espasmo lumbosacral, radiculopatía lumbosacral L5-S1, con prognosis pobre.

dd. Evaluación mental realizada por el Dr. Ricardo Sánchez Lugo el 19 de septiembre de 2006 en la cual se indica: el recurrente lo visitó por primera vez en enero de 2006 y luego cada dos meses, no ha sido hospitalizado por su condición emocional. Se describe con expresión facial de tristeza; vestimenta adecuada; pensamiento ilógico, coherente y relevante; alucinaciones auditivas; hiperactivo al hablar; afecto apropiado, talante y triste; orientado en persona y lugar y con leve dificultad en cuanto al tiempo; memorias inmediata y reciente superficiales; memoria remota adecuada; juicio adecuado; introspección, atención y concentración superficiales; realiza tareas del hogar, va de compras y viaja con supervisión; usa el teléfono; se mantiene aislado e irritable; tiene problemas con la toma de decisiones y la concentración; y no padece de ataques de pánico. Se le diagnosticó depresión mayor severa recurrente, con psicosis y síndrome de estrés post traumático crónico.

ee. Revisión médica del expediente realizada por la Dra. Yarima Marcucci el 22 de enero de 2007 en la cual se indica que el caso no cumple con los criterios del listado 1.05C, 1.11, 1.12, 1.13 y 10.14, por lo que recomienda denegar los beneficios por incapacidad.

jf. Revisión médica del expediente efectuada por el Dr. Rivera el 15 de febrero de 2007, en la cual se señala que el caso no cumple con los criterios del listado 11.04 por lo que recomienda denegar los beneficios por incapacidad. ”

La Junta consideró la referida prueba médica para llegar a la determinación de que el recurrente estaba capacitado para laborar en el servicio público. Concluyó que las condiciones que le aquejaban, tomadas aislada y conjuntamente, no constituían impedimento alguno que cumpliera con el criterio de severidad del listado de incapacidades para que un beneficiario pueda ser elegible para una pensión por incapacidad ocupacional o no ocupacional.
Inconforme, el recurrente presentó el recurso de revisión judicial de epígrafe. Indica que la Junta cometió los siguientes errores:

“A. Erró la Junta de Síndicos del Sistema de Retiro en la interpretación que hace de la ley y el reglamento, ya que es irrazonable y produce resultados inconsistentes con, o contrarios, al propósito de la ley y lleva a la comisión de una injusticia.

B. Erró la Junta de Síndicos al no mencionar y discutir la decisión del Seguro Social que le aprueba la pensión por encontrar que estjá] incapacitado total y permanentemente por cumplir el Listing 12.04 y no tomar en consideración que la parte [recurrente] padece de una seria condición emocional diagnosticada como desorden de estrés post traumático y depresión mayor severa recurrente.

C. Erró la Junta de Síndicos al no mencionar y discutir la decisión del Seguro Social que le aprueba la pensión por encontrar que est[á] incapacitado total y permanentemente por cumplir el Listing 12.06 y no tomar en consideración que la parte [recurrente] padece de una seria condición emocional diagnosticada como desorden de estrés post traumático y depresión mayor severa recurrente.

*1167
D. Erró la Junta de Síndicos al no mencionar y discutir la decisión del Seguro Social que le aprueba la pensión por encontrar que est[á] incapacitado total y permanentemente por cumplir con el Listing 1.04.

E. Erró la Junta de Síndicos en darle más peso a los resúmenes de expedientes de los asesores médicos de la Administración que nunca han visto a la parte recurrente, en vez de darle más peso a los médicos de cabecera de la parte recurrente que le ofrecen tratamiento y conocían bien sus condiciones y establecen que [él] est[á] incapacitadlo] total y permanentemente.

F. Erró la Junta de Síndicos en la definición de lo que es una persona incapacitada total y permanentemente, según la Ley Número 447 del 15 de mayo de 1951.

G. Erró la Junta de Síndicos en concluir que la parte recurrente no cumple con el listado 12:04 de los Listings del Seguro Social y en no tomar en consideración si la combinación de condiciones de[l] [recurrente] [lo] incapacitan totalmente.

H. Erró la Junta de Síndicos al no evaluar la capacidad funcional de la parte [recurrente] para hacer otro trabajo remunerativo, a la luz de su edad, preparación académica y experiencia de trabajo.

I. Erró la Junta de Síndicos en no citar a la vista un perito médico que pudiera testificar en la vista y explicarle al Oficial Examinador si las condiciones de[l] [recurrente] son incapacitantes y si cumplen los listados de Retiro del Gobierno. ”

El Procurador General presentó su alegato. Resolvemos.
II
La Ley 447 establece un sistema de retiro y beneficios para los empleados del Gobierno elegibles que aporten a estos programas. Pérez et als. v. Depto. de la Familia, 156 D.P.R. 223, 230 (2002). Entre otros beneficios, el Artículo 2-109 de la Ley 447, según enmendado, 3 L.P.R.A. see. 770, reconoce el derecho a una anualidad por incapacidad no ocupacional a “[t]odo participante que, teniendo por lo menos 10 años de servicios acreditados, se inhabilitare para el servicio, debido a un estado mental o físico y que por razón de ese estado estuviere incapacitado para cumplir los deberes de cualquier cargo que en el servicio del patrono se le hubiere asignado. ”
Por su parte, el Artículo 2-107 de la Ley 447, según enmendado, 3 L.P.R.A. see. 769, dispone, en lo pertinente, lo siguiente:

“Todo participante que, como resultado de una incapacidad que se origine por causa del empleo y surja en el curso del mismo, quedare incapacitado para el servicio, tendrá derecho a recibir una anualidad por incapacidad ocupacional, siempre que:

(a) Se recibiere suficiente prueba médica en cuanto a la incapacidad mental o física del participante conforme a los criterios que mediante reglamento fije el Administrador.

(b) El participante o el patrono, de acuerdo con los reglamentos de la Junta, notifique al Administrador con respecto a dicha incapacidad.

(c) El Fondo del Seguro del Estado determine que el accidente o enfermedad provino de cualquier función del trabajo o sea inherentemente relacionado al trabajo o empleo. ”

Además, el Artículo 2-111 de la Ley 447, según enmendado, 3 L.P.R.A. see. 771, establece, en lo pertinente, que:

*1168
“Para los fines de una anualidad por incapacidad ocupacional o no ocupacional, se considerará incapacitado a un participante cuando la incapacidad esté sustentada con suficiente prueba médica conforme a los criterios que mediante reglamento fije el Administrador y dicha prueba revele que el participante está imposibilitado para cumplir los deberes de cualquier cargo que en el servicio del patrono se le hubiere asignado. ’’

Estos criterios médicos se incorporaron en el Reglamento para la Concesión de Pensiones por Incapacidad a los(as) Participantes de los Sistemas de Retiro de los(as) Empleado(a)s del Gobierno y la Judicatura, Reglamento Núm.' 6719 de 5 de noviembre de 2003 (Reglamento). En la Sección 6.1 (J) del Reglamento se establece lo siguiente:

“Para los fines de una anualidad por incapacidad, se considerará incapacitado(a) a un(a) participante cuando la incapacidad esté sustentada con suficiente prueba médica, conforme a los Criterios adoptados por el (la) Administrador(a), y dicha prueba revele que el(la) participante está inhabilitado(a) para cumplir los deberes de cualquier cargo que en el servicio del patrono se le hubiere asignado. ”

Por su parte, la Sección 6.2 del Reglamento establece como requisitos para solicitar una pensión por incapacidad ocupacional lo siguiente:

“A. Todo(a) participante que, como resultado de una incapacidad que se origine por causa del empleo y surja en el curso del mismo, quedare incapacitado(a) para el servicio, tendrá derecho a recibir una anualidad por incapacidad ocupacional. Para tener derecho a una pensión por incapacidad ocupacional bajo este Artículo, será requisito que el participante:

J) Sea participante activo(a) a la fecha en que ocurre el accidente por el cual solicita una anualidad por incapacidad ocupacional;

2) La Corporación del Fondo del Seguro del Estado (CFSE) determine que el accidente o enfermedad provino de cualquier función del trabajo o que sea inherentemente relacionado al trabajo o empleo, a tenor con lo dispuesto por la Ley del Sistema de Compensaciones por Accidentes del Trabajo, Ley 45 del 18 de abril de 1935, según enmendada;

3) Radique su solicitud dentro de los ciento ochenta (180) días en que la CFSE emita dicha determinación;

4) Se reciba la Certificación de Compensabilidad para la Administración, (modelo CFSE 0037, Abr. 2002), que emitirá la Corporación del Fondo del Seguro del Estado, sobre el accidente por el cual solicita la incapacidad ocupacional;

5) Se reciba suficiente evidencia médica;

6) Cumpla con la Sección 6.1 de este Reglamento.

B. El(la) Administradora) podrá solicitar a la Corporación del Fondo del Seguro del Estado los informes médicos de exámenes practicados al(la) empleado(a) y cualquier otro documento relacionado con el accidente del trabajo que motive la reclamación. El(la) Administrador!a) de la Corporación del Fondo del Seguro del Estado pondrá a su disposición dichos informes.

C. El importe de la anualidad será igual al cincuenta por ciento (50%) del último tipo de salario que hubiese tenido derecho a percibir el(la)'participante estando en servicio activo. Para todo(a) nuevo(a) participante, el importe será igual al cuarenta por ciento (40%) del último tipo de salario que hubiese tenido derecho a 
*1169
percibir estando en servicio activo.

En cuanto a la concesión de pensión por incapacidad no ocupacional, la Sección 6.3 del Reglamento establece los siguientes requisitos para ser acreedor a la misma:

“A. Todo(a) participante que se inhabilitare para el servicio, debido a un estado mental o físico y que por razón de ese estado estuviere incapacitado(a) para cumplir los deberes de cualquier cargo que en el servicio del patrono se le hubiere asignado, tendrá derecho a una anualidad por incapacidad no ocupacional. Para tener derecho a una pensión por incapacidad no ocupacional bajo este Artículo, será requisito que el participante:

1) Se encuentre en servicio activo a la fecha de radicación de la solicitud;

2) Tenga por lo menos diez (10) años de servicios acreditados;

3) Cumpla con la Sección 6.1 de este Reglamento.

B. El importe de la anualidad será el uno y medio por ciento (1'/2%) de la retribución promedio, multiplicado por el número de años de servicios acreditados hasta veinte (20) años, más el dos por ciento (2%) de la retribución promedio multiplicado por el número de años de servicio acreditados en exceso de veinte (20) años. ”

Por su parte, el Artículo 5. (6) del Reglamento define “incapacidad” como “la inhabilidad e imposibilidad del(de la) participante para cumplir los deberes de cualquier cargo que en el servicio del patrono se le hubiere asignado, conforme a los Criterios médicos establecidos por el(la) Administrador(a) en el Manual para la Evaluación de Incapacidad de la Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura. ” Además, dispone que la “incapacidad total y permanente” es “cuando la condición médica del(de la) participante es de tal naturaleza, que no se espera recuperación alguna, conforme a los Criterios médicos establecidos por el(la) Administradora) en el Manual para la Evaluación de Incapacidad de la Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura.” Artículo 5. (7) del Reglamento.
El Manual para la Evaluación de Incapacidad de la Administración de los Sistemas de Retiro de los Empleados de Gobierno y la Judicatura (Manual) es un apéndice del Reglamento. El Manual “contiene los códigos médicos con el grado de severidad y hallazgos médicos requeridos para determinar si existen las condiciones físicas y/o mentales que, por su naturaleza, resultan incapacitantes. El Manual provee, además, las normas aplicadas durante el proceso de evaluación de determinaciones de incapacidad.” Manual, APLICABILIDAD Y PROPÓSITO.
En la parte de INFORMACIÓN GENERAL del Manual se establece que:

“A. Definición de Incapacidad para la Administración de los Sistemas de Retiro:

Se considerará incapacitado a un participante, cuando la incapacidad esté sustentada con suficiente prueba médica, conforme a los criterios aquí establecidos, que revele que el participante está imposibilitado para cumplir los deberes de cualquier cargo que en el servicio del patrono se le hubiere asignado. Dicha imposibilidad deberá durar un período no menor de doce (12) meses.

Se considerará una incapacidad como total y permanente, cuando las condiciones que lo incapacitan sean de tal naturaleza, que no se espere recuperación alguna.

*1170
B. Definición de Incapacidad médicamente determinable:

Una incapacidad médicamente determinable es aquella que resulta de alteraciones anatómicas, fisiológicas o sicológicas que puedan ser demostradas por la clínica, estudios y pruebas de laboratorio médicamente aceptables. La evidencia médica debe incluir signos, síntomas y hallazgos de estudios y laboratorios que permitan al Médico Asesor analizar y establecer, de forma fiel y objetiva, el grado de limitación correspondiente.

El diagnóstico, las alegaciones y quejas de síntomas del reclamante, no se consideran como incapacitantes por sí solas.

C. Evidencia médica aceptable:

Se considera evidencia médica aceptable, toda aquella presentada por las fuentes de tratamiento del reclamante, ya sea copia de expedientes médicos, de hospitalizaciones o cuestionarios provistos por la Administración, además de todo estudio, resultado de laboratorio o examen mental concerniente a los diagnósticos, alegaciones y quejas del reclamante. ”

Las opiniones o decisiones de incapacidad emitidas por otras fuentes, no obligan a la Administración a otorgar una incapacidad.

“D. Proceso de evaluación:

1.Se evaluará la evidencia, según los criterios establecidos en los Códigos Médicos, si:

a. llena los requisitos de los mismos; o

b. si iguala los requisitos. Se entiende por igualar, si:

1. la condición médica tiene el mismo nivel de severidad que se establece en el código, pero se llegó a la misma por pruebas o exámenes médicos equivalentes y no necesariamente a través de los requisitos específicos que exigen el mismo; o

2. si una condición médica no está contemplada en ninguno de los códigos, pero la severidad es similar o comparable a uno ya establecido; o

3. que un impedimento contemplado en un código no esté presente y pueda ser sustituido por otro equivalente y de igual severidad; o

c. por combinación de impedimentos;

1. Cuando las condiciones médicas documentadas, por sí solas, no llenan ni igualan un código en particular, pero al considerarse en conjunto alcanza un grado de severidad incapacitante.

La combinación será por el conjunto de las condiciones físicas, por el conjunto de las condiciones mentales o por combinación de ambas.

2. Si cumple con los requisitos administrativos de la Ley 447 de 15 de mayo de 1951, según enmendada: a) Se considerará la posibilidad de combinación del Fondo del Seguro del Estado. Si no cualifica, entonces,

*1171
b) Se considerará la posibilidad de combinación de condiciones no relacionadas.

c) En el caso de que la combinación de condiciones relacionadas por la Corporación del Fondo del Seguro del Estado y las no relacionadas, resulten incapacitantes, se adjudicará como Incapacidad no Ocupacional.

2. Si se determina que el participante está incapacitado, se otorgará el beneficio como total o permanente, si no se espera recuperación médica alguna. De no ser así, se otorgará el beneficio con exámenes médicos periódicos. ”

Además, en la parte de CÓDIGOS MÉDICOS del Manual se dispone que:

“La evaluación médica se basará en trece (13) códigos, descritos a continuación. Cada uno incluye una introducción general que contiene la definición de los conceptos claves que se usan en los mismos. También, se incluye en esta introducción, determinados hallazgos médicos específicos; algunos de los cuales son necesarios para establecer un diagnóstico o confirmar la presencia de una condición incapacitante. Si los hallazgos necesarios para sustentar una condición médica, no se encuentran en la introducción, o en cualquier otra parte del código, aún así, ésta tiene que establecerse mediante pruebas diagnósticas clínicas de estudios y laboratorios médicamente aceptables.

Seguido a la introducción, cada código contendrá el grado de severidad y hallazgos médicos requeridos para llenar el mismo. De no llenar la severidad requerida por el código, se podrá considerar la incapacidad por el concepto de igualar o el de combinación de impedimentos, según se establece en la sección de normas y procedimientos de este Manual.

Los códigos están divididos en la siguiente forma:

I.0 Sistema Musculoesqueletal

2.0 Sentidos Especiales y Habla

3.0 Sistema Respiratorio

4.0 Sistema Cardiovascular

5.0 Sistema Gastrointestinal

6.0 Sistema Genitourinario

7.0 Sistema Hemático y Linfático

8.0 Piel

9.0 Sistema Endocrino y Obesidad

10.0 Sistema Neurológico

II.0 Trastornos Mentales

12.0 Enfermedades Neoplásticas

*1172
12.0 Sistema Inmunológico”.

El Tribunal Supremo ha establecido que, conforme este esquema, una incapacidad leve que limita las funciones de un empleado pero no le impide llevar a cabo las funciones de su trabajo o de cualquier otro empleo remunerativo, no da base para recibir una pensión bajo la Ley 447. La incapacidad debe ser de tal naturaleza que le inhabilite para desempeñar las tareas que realizaba en su puesto o las de otro empleo remunerativo comparable. Padín v. Retiro 172 D.P.R. _ (2007), 2007 J.T.S. 151; Sánchez v. A.S.R.E.G.J., 116 D.P.R. 372, 376 (1985).
De otra parte, la norma establecida es que las decisiones de los organismos administrativos se presumen correctas y gozan de deferencia por los tribunales. Rivera Concepción v. A.R.P.E., 152 D.P.R. 116, 123 (2000). La facultad revisora de los tribunales de las decisiones administrativas incluye las siguientes áreas: (1) concesión del remedio apropiado; (2) revisión de las determinaciones de hechos conforme al criterio de evidencia sustancial; y (3) revisión de las conclusiones de derecho en su totalidad. T-JAC, Inc. v. Caguas Centrum Limited, 148 D.P.R. 70, 80-81 (1999).
“Las determinaciones de hechos de las decisiones de las agencias serán sostenidas por el tribunal, si se basan en evidencia sustancial que obra en el expediente administrativo. ” See. 4.5 de la Ley de Procedimiento Administrativo Uniforme (LPAU), según enmendada, 3 L.P.R.A. see. 2175. Sin embargo, “[l]as conclusiones de derecho serán revisadas en todos sus aspectos por el tribunal. ” Id.
El criterio rector en la revisión judicial de una determinación de hechos de una agencia es la existencia de evidencia sustancial en el expediente administrativo. A estos fines, se ha definido evidencia sustancial como “aquella evidencia pertinente que una mente razonable pueda aceptar como adecuada para sostener una conclusión”. Ramírez v. Depto. de Salud, 147 D.P.R. 901, 905 (1999). De ordinario, los tribunales no intervendrán en las determinaciones de hechos de las agencias, mientras exista evidencia sustancial en apoyo de las mismas. Pacheco v. Estancias de Yauco, 160 D.P.R. 409, 432 (2003). Dicho análisis requiere que la evidencia sea considerada en su totalidad; esto es, tanto la que sostenga la decisión administrativa como la que menoscabe el peso que la agencia le haya conferido. Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R., 144 D.P.R. 425, 437 (1997).
Para sostener la posición de que no existe evidencia sustancial que apoye las determinaciones de la agencia administrativa, la parte afectada debe demostrar que existe “otra prueba en el récord que razonablemente reduzca o menoscabe el peso de tal evidencia hasta el punto de que un tribunal no pueda, concienzudamente, concluir que la evidencia sea sustancial, en vista de la totalidad de la prueba presentada... y hasta el punto que se demuestre claramente que la decisión [de la agencia] ... no está justificada por una evaluación justa del peso de la prueba.” Hilton Hotels v. Junta Salario Mínimo, 74 D.P.R. 670, 686 (1953). La prueba ofrecida deberá desfavorecer la presunción de que la determinación del organismo administrativo se desprende de la totalidad de la prueba que éste tuvo ante su consideración. Véase, Ramírez v. Depto. de Salud, 147 D.P.R., a las págs. 905-906.
Conforme a lo dispuesto por ley, existe una práctica judicial claramente establecida de conceder gran consideración y deferencia a las decisiones de los foros administrativos. Otero v. Toyota, 163 D.P.R. 716, 727 (2003); Rebollo v. Yiyi Motors, 161 D.P.R. 69, 77 (2004). Dicha deferencia emana del reconocimiento de que, de ordinario, las agencias administrativas están en mejor posición para hacer determinaciones de hechos al tratar con una materia sobre la cual tienen un conocimiento especializado. Otero v. Toyota, 163 D.P.R., a la pág. 727. Más aún, cuando una determinación de una agencia esté sustentada por evidencia sustancial que obre en el expediente del caso, los tribunales deben abstenerse de sustituir el criterio de la agencia por el judicial. Ramírez v. Depto. de Salud, 147 D.P.R., a la pág. 905.
*1173 III
En el presente caso, el recurrente plantea que la Junta erró al concluir que no estaba incapacitado. Al discutir en conjunto todos sus señalamientos de error alega, en síntesis, que, según la totalidad de la prueba médica en el expediente, está total y permanentemente incapacitado para llevar a cabo las funciones de su empleo o de cualquier otro empleo comparable en el Gobierno. De las varias condiciones que padece, el recurrente se limitó a discutir, de manera general, que cumplía con los requisitos de severidad de los listados de incapacidad aplicables para la condición mental y la de desórdenes de la espina vertebral, por lo que nos limitaremos a discutir éstas.
En primer lugar, la Junta utilizó el siguiente criterio médico para evaluar la condición mental del recurrente:

“11.04 Trastornos afectivos

Están caracterizados por un disturbio en el estado del ánimo que se compara por un síndrome maníaco o depresivo, total o parcial. Animo (mood) se refiere a una emoción prolongada que matiza toda la vida psíquica y que envuelve, usualmente, un estado de depresión o de euforia.

El nivel de severidad requerido para estos trastornos se alcanza cuando los requisitos en A y B son satisfechos o cuando se satisfacen los requisitos en C.

A. Persistencia médicamente documentada, tanto de forma continua como episódica, de uno de los siguientes:

1. Síndrome depresivo caracterizado al menos por cuatro de los siguientes:

a. Anhedonia o pérdida persistente del interés en casi todas las actividades: o

b. Disturbios del apetito con cambios en el peso; o

c. Disturbios en el sueño; o

d. Agitación o retardación psicomotora; o

e. Disminución de la energía; o

f Sentimientos de culpa o de inutilidad; o

g. Dificultad en la concentración o en el pensamiento; o

h. Pensamientos suicidas; o

i. Alucinaciones, delirios o pensamiento paranoide; o

2. Síndrome maníaco caracterizado al menos por tres de los siguientes:

a. Hiperactividad; o

b. Habla apresurada; o

c. Fuga de ideas; o

*1174
d. Autoestima exagerada; o

e. Disminución de la necesidad de dormir; o

f Fácilmente distraído; o

g. Envolvimiento en actividades que tienen un alto potencial para producir consecuencias dolorosos que no son reconocidas como tal; o

h. Alucinaciones, delirios o pensamientos paranoide; o

3. Síndrome bipolar con un historial de períodos episódicos manifestados por el cuadro sintomático completo de ambos síndromes, depresivo y maníaco (actualmente caracterizados lo mismo el uno o por ambos síndromes); y

B. Resultando por lo menos en dos de los siguientes:

1. Restricciones marcadas en las actividades del diario vivir; o

2. Dificultades marcadas para mantener la concentración, persistencia o ritmo; o

3. Episodios repetidos de descompensación con duración prolongada; o

A. Historial médicamente documentado de un trastorno mental orgánico crónico, de por lo menos dos (2) años de duración, que haya causado más de una limitación mínima en la habilidad para realizar actividades laborales básicas y con síntomas y signos actualmente disminuidos mediante la medicación o el apoyo psicosocial, y uno de los siguientes:

1. Episodios repetidos de descompensación con duración prolongada; o

2. Residuales de la enfermedad que resulten en un ajuste marginal, de tal grado que se podría predecir que un aumento mínimo en las demandas mentales o cambios en el medio ambiente podrían ocasionar una descompensación en el individuo; o

3. Historial actual de un año o más de inhabilidad para funcionar fuera de un ambiente altamente protegido, y con una indicación de que necesita mantenerse en dicho ambiente continuamente. ”

De este listado surge que la condición mental de la persona tiene que cumplir con los requisitos de los incisos A y B o del inciso C. En este caso, la Junta determinó que la condición mental del recurrente no cumplió con los criterios de los listados 11.04 A. 111.04 B. y 11.04 C.
Conforme surge de la Resolución, el recurrente ha sido evaluado por cuatro psiquiatras durante unos nueve años. Sin embargo, la mayoría de éstos coinciden en que la condición del recurrente no es lo suficientemente severa para cumplir con los requisitos del listado 11.04.
En cuanto al listado 11.04 A. 1., la Junta concluyó que no cumplía con, por lo menos, cuatro de los criterios allí establecidos según se requiere. Conforme los varios informes médicos, el recurrente no es una persona que tuviera problemas de anhedonia £ haya perdido el interés en las cosas, sino que se le describe como cooperador y con apariencia normal. Tampoco súrge que tenga disturbios del apetito o cambios de peso y se le indica que está bien desarrollado y nutrido. Además, no se expresa que tenga disminución en la energía, sentimientos de *1175 culpa o inutilidad, ni ideas suicidas y no se describe con concentración marcadamente limitada.
Sobre el listado 11.04 B., la Junta indicó que el recurrente tampoco cumplía porque no surgía que tuviera restricciones marcadas en el diario vivir, ya que él manifestó durante la vista administrativa que va al supermercado con su esposa, realiza ciertas tareas en el hogar, viaja solo y usa el teléfono. Además, no se le describe como una persona que tuviera dificultades marcadas en la concentración. Por último, la Junta concluyó que no padecía de períodos repetidos de descompensación de duración prolongada porque no ha reportado ideas suicidas, no se ha recluido en una institución mental y realiza tareas en su hogar.
En cuanto al listado 11.04 C., según indicado, no surge que el recurrente padecía de períodos repetidos de descompensación de duración prolongada, ni que es un individuo que se podría predecir que un aumento mínimo en las demandas mentales o cambios en el medio ambiente podrían ocasionar una descompensación en la persona. Tampoco de su historial se desprende que tuviera un año o más de inhabilidad para funcionar fuera de un ambiente altamente protegido y con una indicación de que tuviera que mantenerse en dicho ambiente continuamente. Por lo tanto, tampoco cumple con los criterios de este listado.
Por otro lado, la Junta evaluó las condiciones de la espina vertebral del recurrente a base del listado 1.05 C., el cual dispone lo siguiente:
“ 1.05 Desórdenes de la Espina Vertebral

C. Otros desórdenes vertebrogénicos (Ej. herniación del núcleo pulposo, estenosis espinal) con persistencia de los siguientes por lo menos durante tres meses, a pesar de estar bajo tratamiento, y que se espera duren por lo menos doce (12) meses consecutivos. Con ambos 1 y 2:

1. Dolor, espasmo muscular y limitación significativa del arco de movimiento de la columna; y

2. Pérdida motora, de fuerza muscular, sensorial y de reflejos significativas. ”

La Junta encontró que la prueba médica presentada demostró que la condición del recurrente no cumplía con los criterios de severidad requeridos en este listado médico. Se evaluaron las condiciones tanto cervicales como las lumbosacrales del recurrente.
Sobre las condiciones de “strain” cervical, trauma cervical, miositis cervical, radiculopatía cervical y cambios espondilóticos de la región cervical C6-C7, en una radiografía de la región de febrero de 2002 se indicó como impresión que se encontraba normal (“normal cervical spine”). En evaluación de marzo de 2002 del Dr. Rolando Colón se le diagnosticó contusión en la región cervical, pero se indicó que la columna cervical se encuentra en línea media, el arco de movimiento está dentro de los límites normales y no tiene espasmos musculares en la región. Además, en evaluación de abril de 2006, el Dr. Stella indica que padece de “sprain” cervical y en el cuello tiene dolor en la flexión y al extender los movimientos laterales, pero el sistema motor está normal, el sistema sensorial es adecuado, tiene reflejos presentes y un examen electromiográfico digital da un resultado normal. Igualmente, en un MRI de la región cervical de mayo de 2006 se concluye que es normal. En un MRI en agosto de 2006 de la espina cervical se indica que padece de cambios espondilóticos a nivel C6-C7 y se descarta que padezca de herniación de discos y estenosis canal espinal. El 24 de agosto de 2006, se le practicó un examen electromiográfico de las extremidades superiores y se le diagnosticó radiculopatía cervical C5-C6. En su informe de septiembre de 2006, el Dr. Rodríguez Ryan indica que padece de radiculopatía cervical y cambios espondilóticos en la región. Añade que la fuerza muscular es de 4/5 en las extremidades, sin atrofia, con reflejos presentes y espasmos en la región cervical.
De lo anterior surge que las condiciones que el recurrente padece en la región del cuello no cumplen con los *1176 requisitos de severidad'establecidos en el listado 1.05 C. 2. De dicha prueba médica no se demostró que el recurrente padeciera de pérdida motora, de fuerza muscular, sensorial y de reflejos que sea significativa, por lo que no incidió la Junta al confirmar a la Administración.
En cuanto a las condiciones que padece en la región lumbosacral de la espina vertebral, trauma lumbar, trauma sacral, “sprain” lumbosacral y radiculopatía L5-S1, en una radiografía de la región de enero de 1997 se obtuvo un resultado normal (normal lumbosacral spine). En la evaluación ortopédica del Dr. Colón de marzo de 2002 no se incluye diagnóstico alguno en la región lumbosacral. Por su parte, en la evaluación de abril de 2006, el Dr. Stella tampoco incluye diagnóstico alguno de la región lumbosacral e indica que el tamaño, fuerza y tono muscular son normales, reflejos presentes y sistema sensorial normal. En dos exámenes electromiográficos que se le realizaron en abril y agosto de 2006 se obtuvieron resultados normales. Además, en agosto se le realizó un MRI de la espina lumbar en el cual se concluye que hay cambios espondiloartríticos a nivel L5-S1 asociados con entrampamiento, pero se descarta que padezca de herniación de discos en la región, y en otro examen electromiográfico de las extremidades inferiores se indica que padece de una radiculopatía lumbar L5-S1. El Dr. Rodríguez Ryan, en el informe de septiembre de 2006 incluye como un diagnóstico la condición de radiculopatía lumbosacral L5-S1 con espasmos.
Conforme lo anterior, las condiciones que padece el recurrente en la región lumbosacral de la espina vertebral no cumplen con los requisitos de severidad establecidos en el listado 1.05 C. 2. La referida evidencia médica no demostró que en esa región el recurrente tuviera una pérdida motora, de fuerza muscular, sensorial y de reflejos que sea significativa, por lo que no tiene razón el recurrente.
El recurrente indica, además, que erró la Junta al no mencionar y discutir la pensión total y permanente que le concedió la Administración del Seguro Social Federal (Seguro Social). En este caso, el hecho de que la Junta no discutiera la conclusión del Seguro Social no significa que incidió en su decisión porque la determinación de ésta no obliga a la Junta en su dictamen de incapacidad de un participante del Sistema de Retiro. La Junta hizo su determinación a base de la prueba sometida y su evaluación de la misma a la luz de los criterios médicos aplicables. Por lo tanto, no tiene razón el recurrente y la omisión de discutir la decisión del Seguro Social en cuanto a su determinación de incapacidad no tiene la consecuencia de alterar las conclusiones de la Junta.
Aun cuando la Administración y el Seguro Social utilizan criterios similares para determinar si una persona está incapacitada para trabajar y la Administración puede considerar la determinación de incapacidad del Seguro Social, esto no significa que la Administración está obligada por la decisión del Seguro Social. A estos fines, en López v. Administración, 168 D.P.R. _ (Sentencia 2006), 2006 J.T.S. 146, a la pág. 121, el Tribunal Supremo indicó:

“El hecho que la Administración utilice el mismo listado de criterios que usa la Administración del Seguro Social no la obliga en las determinaciones sobre incapacidad, sobre todo cuando el Reglamento establece claramente el grado de incapacidad a probarse, que debe ser total y permanente. En específico, el empleado será considerado capaz si no prueba su incapacidad total y permanente. La agencia queda autorizada a determinar, basada en la evidencia sometida, si hay o no incapacidad para la concesión de la pensión. ”

Por último, el recurrente indica que la Junta erró al no citar un perito médico que pudiera testificar y explicar si las condiciones de salud de éste cumplen con los criterios de incapacidad exigidos por la agencia recurrida.
Conforme lo establecido en la Ley 447 y el Reglamento, la determinación sobre la incapacidad del solicitante se toma a base de la prueba médica que consta en el expediente según el listado de los criterios médicos de incapacidad pertinentes. Arts. 2-107 y 2-111 de la Ley 447, según enmendados, 3 L.P.R.A. sees. 769 y 711; Reglas 24.4 y 25.4 del Reglamento. Además, la agencia utiliza médicos que estudian y analizan el *1177 expediente médico del solicitante y recomiendan si se cumplen los criterios de incapacidad del listado, de forma que la agencia pueda decidir si el solicitante cumple con dichos criterios. En este caso, así procedió la Junta al considerar, como hemos indicado, la pmeba médica reseñada y las revisiones médicas de los expedientes del recurrente que hicieron los Dres. Marcucci y Rivera.
Por otra parte, el recurrente es quien viene obligado a probar que está incapacitado y tiene derecho a la pensión por incapacidad, por lo que debe presentar la prueba necesaria para cumplir con lo anterior. Véase, See. 3.13 (e) de la LPAU, 3 L.P.R.A. see. 2163 (e); Regla 10 (A) de las de Evidencia, 32 L.P.R.A. Ap. IV, R. 10 (A). Si el recurrente consideraba necesario el testimonio de un perito para probar su incapacidad, debió presentarlo. Por lo tanto, procede confirmar el dictamen recurrido.
En resumen, en el caso ante nos, la Junta concluyó que con la prueba médica antes indicada el recurrente no era acreedor a la pensión solicitada porque las condiciones que padece no llenaban los requisitos de severidad de los listados aplicables. Consideramos que la parte recurrida aplicó correctamente el estándar establecido por la Ley 447, a saber: si las condiciones del recurrente lo incapacitaban total y permanentemente para cumplir los deberes de cualquier cargo o empleo retribuido. En consecuencia, las conclusiones de Junta son cónsonas con el propósito de dicha legislación y no son arbitrarias, ilegales o irrazonables, por lo que debemos sostenerlas.
IV
Por los fundamentos expuestos, se dicta sentencia confirmando la resolución recurrida.
Notifíquese.
Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal.
Dimarie Alicea Lozada Secretaria del Tribunal de Apelaciones